**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GENERAL J. PARKER JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **15 CV 10313** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant General J. Parker Jr. seeks judicial review under 42 U.S.C. § 405(g) of a final decision of Defendant, the Commissioner of the Social Security Administration ("SSA"), denying his claim for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Claimant's motion to reverse or remand the final decision of the Commissioner (Dkt. 16) is granted and the Commissioner's motion for summary judgment (Dkt. 26) is denied.

## I. BACKGROUND

### A. Procedural History

On October 8, 2013, Claimant filed a Title II DIB application and a Title XVI SSI application, alleging a disability onset date of July 5, 2013. (R. 183-196.) His initial

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

claim was denied on January 21, 2014 and again upon reconsideration on August 18, 2014. (R. 110, 119.) After both denials, Claimant filed a hearing request, and a hearing was held before an Administrative Law Judge ("ALJ") on January 20, 2015. (R. 38-85, 141–42.) Claimant appeared along with his representative. A Vocational Expert ("VE") was also present and offered testimony. On July 6, 2015, the ALJ issued a written decision denying Claimant's applications for DIB and SSI. (R. 20-32.) Claimant then requested review by the Appeals Council. (R. 13-16.) On October 5, 2015, the Appeals Council denied his request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1-5.); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). This action followed.

**B.** **Medical Evidence**

Claimant claims he is disabled due to left wrist and ankle problems, heart issues and hypertension, and degenerative disc disease, among other problems. (R. 93.)

**1.** **Treating Physicians**

Claimant's first treatment of record is from Mercy Hospital St. Louis ("Mercy") on January 6, 2012 with Bryan Menges, D.O., at which time he complained of ongoing headaches and chest pains. (R. 499.) Dr. Menges noted a history of hypertension, heart disease, asthma, and cerebrovascular disease. (R. 500.) Upon exam and further testing, Dr. Menges noted elevated blood pressure, renal insufficiency, likely secondary to hypertension, and headaches likely associated with TMJ. (R. 504.) Claimant was given pain and blood pressure medication, and discharged with instructions to follow up with his primary care physician. (*Id.*)

Claimant returned to Mercy on March 15, 2012, complaining of right knee pain not associated with any recent trauma. (R. 465.) Upon examination, Mark Mason, M.D., noted Claimant's knee was positive for joint swelling, arthralgia, gait problem, and stiffness. (R. 465.) X-rays of the knee were taken, but they revealed no significant abnormalities. (R. 469-70.) There was a focal area of cortical thickening observed, which the reviewing physician opined might be related to a healed fibroma or prior trauma. (*Id.*) Claimant was provided with a knee immobilizer and pain medication, and then discharged. (R. 469.)

The record is silent until July 5, 2013 when Claimant injured his left arm when a steel plate fell on his wrist at work at his construction job. (R. 55.) Following the injury, Claimant reported tenderness and limited range of motion due to pain. (R. 334.) Donn Richards, M.D., diagnosed him with a contusion of the forearm, which he treated with medication and an arm sling. (R. 335.) Imaging showed no evidence of fracture or dislocation. (R. 336.) He was cleared to return to full duty work. (R. 338.)

A few days later, on July 12, 2013, Claimant presented to the Unity Point Health Methodist Emergency Department ("UnityPoint ED") complaining of fever, chills, body aches, sore throat, nasal congestion, cough, nausea, abdominal pain, and continued left wrist pain. (R. 369.) He showed some minor signs of a possible viral infection upon physical exam. (R. 369-370.) Chest imaging showed some patchy infiltrate. (R. 372, 390.) Imaging of his wrist again showed no evidence of acute fracture. (R. 392.) Claimant was discharged and asked to return for a follow-up appointment a few days later. (R. 372.)

Plaintiff presented to Andrew Zidow, M.D. for follow-up on July 15, 2013, with complaints of possible pneumonia due to fever, chills, cough, and shortness of breath. (R. 350.)  He reported a history of myocardial infarction and stroke in 2011, as well as a chronic kidney condition.  (*Id.*)  After a normal physical examination, Dr. Zidow concluded that Claimant had pneumonia and hypertension.  (R. 352.)  Dr. Zidow also noted that Claimant was 71.5 inches (5' 9") tall and weighed 269.2 pounds, resulting in a body mass index ("BMI") of 37.0.[2]  (R. 351.)  Dr. Zidow prescribed a Z-pack and blood pressure medication, and advised Claimant to follow-up to establish routine care and better manage his blood pressure and kidney condition.  (R. 352.)

Claimant returned to see Dr. Zidow on July 25, 2013, and reported that he was still coughing and suffering episodic chest pains.  (R. 346.)  Claimant explained that he was treated by a cardiologist following his 2011 heart attack, but that he had not continued care following his move to Peoria.  (*Id.*)  At the time of this appointment, he was unemployed and living with friends.  (*Id.*)  Claimant also complained of residual soreness from his wrist injury.  (*Id.*)  Upon examination, Dr. Zidow found no abnormalities and noted Claimant had a normal gait.  (R. 347-48.)  Dr. Zidow assessed chronic kidney disease, likely secondary to hypertension, and coronary artery disease. (R. 348.)  Dr. Zidow suggested various medications and follow-up testing, though Claimant was resistant to some of those suggestions.  (*Id.*)  Dr. Zidow also noted a history of noncompliance with medication.  (*Id.*)

---

[2] An individual's BMI is "a measure of body fat that gives an indication of nutritional status." *Dorland's Medical Dictionary* http://www.dorlands.com (last visited Feb. 1, 2017).  The World Health Organization classifies any BMI greater than 30 as "obese."  *World Health Organization* http://apps.who.int/bmi/index.jsp?introPage=intro_3.html (last visited Feb. 1, 2017).

At his next appointment with Dr. Zidow on August 12, 2013, Claimant reported compliance with his medications, though he was unable to start one of the medications suggested for heart disease due to price concerns. (R. 342.) A physical exam was primarily unremarkable. (R. 344.) Dr. Zidow again assessed coronary artery disease, hypertension – stage two, hyperlipidemia, and prescribed him medicine that would be on the $4 list at Walmart. (*Id.*) He was also referred to the cardiology department for further management. (*Id.*)

Claimant presented to the UnityPoint ED on September 14, 2013, complaining of a cough, sore throat, sinus congestion, an earache, chest pain, and fatigue. (R. 381.) He reported he had been off of his medication for a while because he could not afford it. (R. 379.) David Dean, M.D., found Claimant's symptoms to be consistent with acute bronchitis and admitted him to the medical unit. (R. 382, 387.) The next day, Claimant continued to complain of upper respiratory issues including nasal congestion, sore throat, and cough. (R. 361.) While at the hospital, he developed sharp chest pain, which he described as "stabbing" that radiated to his back. (*Id.*) Testing showed no cardiac stress-induced ischemic changes, though an ECG revealed some abnormal results. (R. 388, 396.) The consulting cardiologist opined that the chest pain was likely secondary to viral illness as opposed to any acute coronary syndrome. (R. 360, 366.) Claimant's discharge diagnoses were chest pain (resolved), upper respiratory infection, hypertension (improving), chronic kidney disease, and coronary artery disease. (R. 359.) He was discharged on September 16, 2013, provided medication, and instructed to follow-up with Dr. Zidow. (R. 360.)

Next, Claimant presented to HeartCare Midwest on November 27, 2013, for a consultation based on his history of chest pains and shortness of breath.  (R. 414.) Marco Barzallo, M.D., reviewed Claimant's medical history including hypertension, degenerative disc disease, and myocardial infarction.[3]  (R. 416.)  He also noted that Claimant's BMI was 38.52.  (R. 414.)  Claimant complained of hip/leg pain, knee pain, and back pain upon ambulation.  (R. 416.)  Dr. Barzallo ultimately opined that although Claimant may have some diastolic dysfunction, his shortness of breath was likely related to his weight and deconditioning.  (R. 414.)  Claimant was advised to lose weight, exercise and return for a follow-up in six months.  (R. 415.)

Claimant was treated at Saint Francis Medical Center on May 16, 2014 with complaints of acute worsening pain in his left arm related to his previous injury and swelling in his right leg.  (R. 429.)  He denied chest pain or shortness of breath.  (*Id.*) There was no evidence of deep venous thrombosis in the right leg.  (R. 434.) He was provided with pain medication, and reminded to re-start his blood pressure medication.  (R. 431, 436.)  Claimant appeared to follow-up with a Dr. Rufus at Proctor Hospital the following week.  (R. 525.)  An upper extremity exam was unremarkable. (*Id.*)

Shortly thereafter, on May 26, 2014, Claimant presented to the UnityPoint ED for recurrent moderate back pain of the lumbar spine, which was not associated with a known injury.  (R. 446.)  The pain was aggravated by bending, twisting, and certain positions.  (*Id.*)  He was assessed with a sprain of his lumbar region and given pain medications.  (R. 448.)

---

[3] Dr. Barzallo also noted Claimant's history of essential hypertension – benign, transient ischemic attack, and prostate enlargement.  (R. 416.)

On June 6, 2014, Claimant presented for a neurology consult with Howard Liu, M.D. (R. 451.) Dr. Liu noted that Claimant had complained of weakness and tingling in his left arm since his work injury, as well as back pain. (*Id.*) Upon examination, Dr. Liu noted that Claimant had normal range of motion in his extremities. (R. 453.) He also noted that Claimant was 5' 11" and 284 pounds, resulting in a BMI of 39.71. (*Id.*) Dr. Liu ordered an EMG, referred Claimant to physical therapy, and prescribed Neurontin. (R. 454.) He also recommended regular exercise. (*Id.*)

Claimant returned to see Dr. Rufus on June 25, 2014 with continued wrist pain, as well as intermittent back pain. (R. 525.) An exam of both wrists showed fairly normal range of motion, no effusion, tenderness, or deformities. (*Id.*) His grip and strength were reported as normal. (*Id.*)

On June 30, 2014, Claimant presented for the EMG of his left wrist, which was conducted by Tony Jacob, M.D. (R. 455.) Dr. Jacob was unable to complete the test due to Claimant's pain, but it did show left ulnar neuropathy. (R. 455.) A few days later, Claimant reported to Dr. Liu that his left arm weakness had improved with therapy, but that he was still suffering from back pain. (R. 457.) Dr. Liu increased Claimant's medication and recommended further physical therapy for back pain. (R. 458.) He opted to treat Claimant with more medication and physical therapy. (*Id.*)

At an appointment with Dr. Rufus in August 2014, Claimant continued to complain of intermittent back pain, but exhibited normal flexion, and no tenderness. (*Id.*) He explained that his back pain had worsened following a recent run-in with police. (*Id.*) Claimant did not appear for his next appointment the following month. (*Id.*)

In November 2014, Claimant was discharged from his physical therapy sessions, which he began in June. (R. 565.) He often complained to his therapist about continued arm and back pain. (R. 546-65.) Therapy notes do indicate a "severe" problem with walking, a "negligible" ability to participate in work-related activities, and limited range of motion in his back. (R. 554, 564.) Upon discharge, the therapist commented that Claimant demonstrated only slight improvement overall, but did question whether his "sporadic" attendance may have limited his progress. (R. 565.)

On January 8, 2015, Claimant returned to see Dr. Liu for follow-up. (R. 527.) At his appointment, Claimant reported that his left arm pain had worsened following an incident with police in August 2014 during which his arm was shut in a car door. (*Id.*) On examination, Claimant complained of pain in his left arm upon movement. (R. 528.) Dr. Liu recommended a different pain medication. (R. 529.) In April 2015, he continued to complain to Dr. Liu of left arm pain and weakness. (R. 539.) A recent EMG showed left ulnar neuropathy. (*Id.*)

### 2. Agency Physicians

Claimant was examined by Dr. William Lopez on December 6, 2013 for a consultative exam. (R. 407-12.) Claimant reported that he had experienced pain and stiffness in his lumbar back for fifteen years, which is triggered if he sits or stands for more than thirty minutes or walks for more than one block. (R. 407-408.) His prior treatment included steroid injections and physical therapy, which reportedly provided minimal relief. (R. 407.) Claimant also reported pain in his left ankle that has persisted since a 1982 injury, and which is aggravated with prolonged walking. (R. 408.) His knee also occasionally gives way. (*Id.*) He described a history of left ankle (1982), left

8

wrist (1983), and left knee (1983 and 1994) surgeries.  (*Id.*)  According to Claimant, he is able to lift twenty-five pounds, and climb up to fifteen steps.  (R. 409.)  He can drive, occasionally cook, and bathe and groom himself.  (*Id.*)  He denied doing household chores or shopping.  (*Id.*)

Dr. Lopez's examination revealed primarily normal results, though an elevated blood pressure was noted.  (R. 409.)  Claimant's heart was normal, his lungs were clear, and he was able to get on and off the table with no difficulty.  (R. 409-10.)  Dr. Lopez did note that Claimant had a mild antalgic gait, that his range of motion in his right shoulder and lumbar spine was limited, and that he had mild difficulty walking on his toes, walking on his heels, squatting, and hopping on one leg.  (R. 404-06, 410.)  The neurologic exam and mental status exam were normal.  (R. 410.)  Dr. Lopez's impressions included: lumbar degenerative disc disease, arthralgia of the left ankle, probable left ankle degenerative joint disease, congestive heart failure, hypertension, status post left wrist vascular reconstructive surgery, and obesity.[4]  (R. 411.)

On January 8, 2014, Sumanta Mitra, M.D., reviewed Claimant's medical records and opined that he retained the capacity for light exertional work, limited to frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling.  (R. 90.)  She also opined Claimant could never climb ladders, ropes, and scaffolds.  (*Id.*)  Finally, she stated that Claimant could stand or walk around six hours in an eight hour work day.  (R. 89.)

On August 8, 2014, Claimant's records were reviewed by Richard Lee Smith, M.D., who affirmed Dr. Mitra's findings that Claimant retained the capacity for light work.

---

[4] Dr. Lopez's impression also included coronary artery disease – stable, hyperlipidemia, history of transient ischemic attack with no residual complication, and obstructive sleep apnea.  (R. 411.)

(R. 108.)  He assessed Claimant to have the same limitations as Dr. Mitra found upon her review.  (*Id.*)

### C.    Claimant's Testimony

Claimant was present with his attorney at the January 20, 2015 hearing before the ALJ and testified as follows.  (R. 38-45.)  Claimant was 51 years old at the time of his hearing and has three children.  (R. 45-46.)  He has his GED.  (R. 54.)  He was living in a friend's car at the time of the hearing.  (R. 47.)

Claimant most recently worked as a boilermaker.  (R. 76.)  He stopped working in July of 2013 after a steel plate fell on his wrist.  (R. 55.)  Claimant testified that he experiences pain in his left arm and wrist, which makes it hard for him to grip and grasp. (R. 60, 67.)  It is also difficult for him to carry grocery bags that are heavier than the weight of two oranges or pick up buttons or coins.  (R. 67.)  Claimant testified that he attended physical therapy for his left hand, which did help restore some of his range of motion.  (R. 68.)  Despite this improvement, he stated that he continued to experience pain in his hand.  (*Id.*)  Then, in August 2014, his wrist was re-injured when his arm was slammed in a car door, causing him to lose "all the work" he had done in physical therapy.  (*Id.*)

He further testified that he experiences lower back pain, which has persisted for fifteen years and makes it difficult for him to sit or stand for a long time or bend over. (*Id.*)  He stated that after walking one or two blocks he experiences intense pain in his back that requires him to sit down.  (R. 65.)

Claimant first injured his left knee and ankle in 1982 when his leg was run over by a forklift.  (R. 62.)  He testified that since the accident he has had multiple surgeries

on his left ankle. (*Id.*) He stated that his knee has the tendency to "just go out" on him, but that he had not had any specific treatment for his knee or ankle since 2012. (*Id.*) Claimant reported that walking aggravates his knee and ankle pain, causes swelling, and requires him to sit. (R. 65.) Sometimes, he receives medicine to help manage the swelling and pain. (R. 63.)

Next, Claimant testified that he has problems with his heart. (R. 64.) Specifically, Claimant has had several myocardial infarctions. (*Id.*) He reported that he is often tired, experiences chest pains, and has difficulty breathing due to respiratory problems. (*Id.*) He acknowledged that his obesity contributed to his difficulty breathing. (R. 69.)

Claimant spends his days sitting in restaurants or at the library. (R. 70.) He frequently has to use the restroom and has trouble sleeping. (R. 72.) He was prescribed a CPAP machine at some point, but could not afford it. (*Id.*) Claimant takes a number of medications, which cause him side effects such as weight gain, swelling in his legs, and drowsiness. (R. 60.)

### D. Vocational Expert's Testimony

A VE was present and offered testimony during the hearing. The VE first determined that Claimant's past relevant work is most related to the position of skilled boilermaker under the Dictionary of Occupational Titles ("DOT"). (R. 75.)

Next, the ALJ asked the VE to consider whether a hypothetical individual of Claimant's age, education, and experience, who was limited to light exertional work and frequent climbing of ramps, stairs, and ladders, no climbing of ropes and scaffolds, and frequent stooping, kneeling, crouching, and crawling could perform Claimant's past

relevant work. (R. 76.) The VE opined that the hypothetical individual could not perform such work. (*Id.*) The ALJ then asked if there were other jobs in the economy that such an individual could perform, to which the VE responded affirmatively. (*Id.*) The VE explained that the individual could perform unskilled light work as an electronic assembler, a marker, and a polisher. (R. 77.) The ALJ then asked if those jobs would be eliminated if the individual was additionally limited to occasional reaching, handling, and fingering with the non-dominant upper extremity. (R. 77.) The VE testified that the previous jobs would be eliminated, but the individual could perform other jobs such as a rental consultant, order caller, and children's attendant.[5] (*Id.*) The ALJ then asked whether those jobs would remain available to an individual with the original limitations, but who was further limited to using the non-dominant arm only for support or not at all. (R. 77-78.) The VE stated that the individual would still be able to perform work as a children's attendant, but that the other jobs would become unavailable. (R. 78.) But the VE opined that the individual would also be able to perform work as an usher or an information counter clerk. (*Id.*) Based on a study familiar to the VE, these three positions could also be performed if the individual had no use of his non-dominant upper extremity. (*Id.*)

The ALJ then offered a hypothetical of an individual who could only frequently climb ramps, stairs, and ladders, never climb ropes and scaffolds, and frequently stoop, kneel, crouch, and crawl, but who was limited to sedentary work. (R. 78-79.) The VE opined that such an individual could not perform Claimant's past relevant work, but that

---

[5] On cross-examination, the VE opined that an order caller would be the only job that would remain available out of the three he listed for an individual with these limitations if the individual had an additional limitation of standing and walking only six hours total in an eight hour work day. (R. 81.)

such a person could perform jobs such as a circuit board assembler, an address clerk, and a finisher.  (R. 79.)  The ALJ then asked if those jobs would be eliminated if the individual was further limited to occasional reaching, handling, and fingering with the non-dominant upper extremity.  (*Id.*)  The VE testified that the previous jobs would be eliminated, but the individual could perform other jobs such as a call out operator and systems monitor.  (R. 79-80.)  These jobs would remain available if the individual was limited to using the non-dominant upper extremity only for support of the dominant extremity.  (R. 80.)  There would be no sedentary jobs available if the individual had no use of the non-dominant upper extremity.  (*Id.*)

## II.   LEGAL ANALYSIS

### A.   Standard of Review

Because the Appeals Council denied review, the ALJ's findings constitute the final decision of the agency.  *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994).  The findings of the ALJ as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.")  Although the court affords great deference to the ALJ, it must do more than merely rubber stamp the ALJ's decision.  *Griffith v. Sullivan*, 916 F.2d 715 (7th Cir. 1990) citing *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).  In order to affirm the ALJ's decision, the court must find the decision to be supported by substantial evidence on the record as a whole.  *Kepple v.*

*Massanari,* 268 F.3d 513, 515-16 (7th Cir. 2001) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kepple*, 268 F.3d at 516.

The court may not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the court may afford the claimant meaningful review of the ALJ's ultimate findings. *Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). It is not enough that the record contains evidence to support the ALJ's decision and the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review. (*Id.*)

### B. Analysis under the Social Security Act

To qualify for Social Security Title II DIB and Title XVI SSI, a claimant must be under a disability within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217–22 (2002). Pursuant to the Act, a claimant is disabled only if his physical or

mental impairments are of such severity that he is unable to do his previous work and cannot, when "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). Another agency requirement to receive disability insurance benefits is that a claimant must show he was disabled on or before the date his insured status expired. *See* 20 C.F.R. § 404.130 for definition of disability insured status; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a). The ALJ is required to make the following inquiries:

1.      Is the claimant presently engaging in substantial gainful activity?

2.      Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3.      Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.      Is the claimant unable to perform his or her former occupation?

5.      Is the claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). A negative answer at any point, other than step three, ends the inquiry and leads to a determination that a claimant is not disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.

2 (7th Cir. 1985). The claimant has the burden of establishing steps one through four. At step five the burden shifts to the SSA to establish that the claimant is capable of performing work. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The ALJ applied this five step analysis when he issued a written decision denying Claimant's applications for DIB and SSI. As an initial matter, the ALJ found that Claimant met the insured status requirements of the Act through December 31, 2017. (R. 22.) At step one, the ALJ determined that Claimant has not engaged in substantial gainful activity since July 5, 2013, the alleged onset date. (*Id.*) At step two, the ALJ found that Claimant is suffering from the severe impairments of left ulnar neuropathy, degenerative disc disease, chronic heart failure, essential hypertension, and obesity. (R. 22–24.) At step three, the ALJ determined that the Claimant did not have an impairment or a combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 24.)

Next, the ALJ assessed Claimant's RFC and determined that he could perform light work except that he was limited to frequent climbing of ramps, stairs, and ladders, frequent stooping, kneeling, crouching, and crawling, occasional reaching, handling, and fingering with his non-dominant upper extremity, and no climbing of ropes or scaffolds. (R. 25-30.) As a result, the ALJ determined, at step four, that Claimant could not perform his past relevant work as a boilermaker. (R. 30.) But, at the final step, the ALJ determined that he could perform jobs existing in significant numbers in the national economy, such as rental consultant, order caller, and children's attendant. (R. 30–31.)

In making this determination, the ALJ gave great weight to the findings of the State Agency consultants, Dr. Mitra and Dr. Smith, who both opined that Claimant was

capable of performing work at a light exertional level with some additional limitations.[6]
(R. 29.) Among other things, the ALJ noted that Claimant testified to significant difficulty
lifting with his left hand, but pointed out that objective medical evidence demonstrated
normal strength and no muscle atrophy. (R. 30.)

**III.    DISCUSSION**

Claimant now argues that the ALJ erred for a number of reasons, including that
he (1) failed to find Claimant met a Listing at step three; (2) failed to consider the
collective effect of Claimant's impairments; (3) improperly assessed Claimant's
credibility; (4) failed to fully develop the record; and (5) erred at step five in finding that
suitable jobs exist that Claimant could perform.

### A. The ALJ's Step Three Finding is Supported by Substantial Evidence.

Claimant first takes issue with the ALJ's finding that Claimant did not meet Listing
11.14 for peripheral neuropathy. Listing 11.14 requires disorganization of motor
function in *two* extremities, resulting in an extreme limitation in the ability to stand up
from a seated position, balance while standing or walking, or use the upper extremities.
20 C.F.R. § 404 Subpt. P, App. 1 § 11.14A (emphasis added). The ALJ found that the
record supported such a limitation in one extremity due to Claimant's left ulnar
neuropathy, but not in any other extremity. (R. 25.) As a result, the ALJ concluded that
Claimant did not meet the criteria for Listing 11.14. (*Id.*) Claimant now argues that
problems in his knee and ankle constitute significant impairments in his leg, and satisfy
the second extremity requirement of the Listing.

---

[6] Both Dr. Mitra and Dr. Smith found that Claimant could perform light exertional work limited to
frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling and never
climbing ladders, ropes, and scaffolds. (R. 90, 117.)

To be clear, the claimant bears the burden at step three to show that his impairments meet or equal a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment. *Id.*

Here, the ALJ's discussion of Listing 11.14 is brief; however, the court must read the ALJ's decision as a whole. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole, [] because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five.") Early in his decision, the ALJ acknowledged Claimant's complaints regarding his left knee and left ankle, and ultimately found they did not amount to severe impairments at step two. (R. 23.) In doing so, he noted that Claimant had shown a full range of motion in his left leg, full strength and sensation, and no tenderness in his joints. (*Id.*) The ALJ also pointed to evidence which demonstrated Claimant had only mild difficulty hopping or squatting on one leg and a mildly antalgic gait. (*Id.*) Based on the ALJ's review of this evidence, his conclusion at step three that Claimant did not show an "*extreme* limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities" with respect to *two* extremities is supported by substantial evidence. It is of no moment that his comments regarding claimant's lower left extremity are found earlier in his decision. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (where the court did not discount the ALJ's discussion of step three "simply because it appear[ed] elsewhere in the decision.").

Notwithstanding any error with respect to Listing 11.14, Claimant also argues that his impairments are better suited for an analysis under Listing 1.00, covering the musculoskeletal system.[7]  According to Claimant, the record clearly shows he has an "inability to ambulate effectively" or perform "fine and gross movements" on a sustained basis for any reason, including pain.  *See* Listing 1.00(B)(2)(a).

Contrary to Claimant's assertion, the ALJ did consider Claimant's impairments under the musculoskeletal section, including his ability to ambulate, when he examined Listing 1.04, which covers disorders of the spine.  A claimant can satisfy that listing by showing "lumbar spinal stenosis resulting in resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and* resulting in inability to ambulate effectively, as defined in 1.00B2b."  Listing 1.04(C).  The ALJ specifically stated here that he found no evidence of spinal stenosis that resulted in an inability to ambulate effectively.  (R. 24.)  Indeed, the record did not include imaging of Claimant's back.  And, as discussed above, the evidence related to Claimant's left knee and ankle is sufficient to, at a minimum, support the ALJ's finding at step three as related to the musculoskeletal listings.  As discussed below, however, it does not necessarily follow that the ALJ properly considered all of this evidence of Claimant's impairments, both severe and non-severe, when fashioning the RFC and assessing Claimant's credibility.

### B.    The ALJ's RFC and Credibility Assessments are Flawed.

Next, Claimant essentially argues that the ALJ failed to consider the combined effect of all of his impairments when considering his RFC and his ability to perform

---

[7] In his reply, Claimant contends that the Commissioner failed to respond to this argument.  Although the Commissioner did not respond in detail, she did briefly reference Claimant's alleged "inability to ambulate," which relates directly to Claimant's argument on this issue.  (Resp. at 5.)

various jobs.  The RFC is the most a claimant can still do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  When determining disability, the Regulations require an ALJ to consider "the combined effect of all of [Claimant's] impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523(c).  Indeed, when a claimant has several medical problems, the ALJ must consider his condition as a whole.  *Barrett v. Barnhart*, 355 F.3d 1035, 1068 (7th Cir. 2004).  In particular, an ALJ must consider a claimant's obesity or other health conditions in combination with his other medical impairments.  *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).

Here, the ALJ categorized Claimant's obesity as a severe medical impairment and claims to have considered it at step three, yet he failed to specifically articulate what incremental effect obesity would have on Claimant's ability to stand, walk or sit when coupled with his other problems.  *Gentle*, 430 F.3d at 868.  Medical records indicate that Claimant was 5'11" tall and weighed between 265 to 285 pounds during the relevant period, resulting in a body mass index of at least 37.0 (categorized as obese).  (R. 352, 453.)  On several occasions, the Seventh Circuit has criticized ALJs for failing to consider the effect of a claimant's obesity on their other medical impairments, including degenerative disc disease.  *Gentle*, 430 F.3d at 868 (holding that an ALJ was required to discuss the effect a claimant's obesity would have on her ability to sit and stand when she suffered from disc disease); *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) (noting that claimant's obesity on its own was not disabling, but criticizing the ALJ's failure to consider it in combination with claimant's degenerative disc disease and bronchitis).

Further, while the ALJ discussed each of Claimant's impairments individually, such as his knee, ankle, and back problems, he failed to consider and articulate the combined effect of all of his impairments, including a discussion about how collectively, along with obesity, those impairments might in fact hinder his ability to walk, sit, and stand in a full time work setting. *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (finding reversible error where an ALJ discussed the claimant's impairments individually, but did not articulate how her back and leg pain and respiratory problems would affect her ability to work). Given the record before the Court reflecting Claimant's complaints of ankle, knee, back and arm problems, and allegations of severe limitations, an explicit analysis of the combined effects of those impairments, as opposed to just a general statement that all impairments were considered, is required.

Without a discussion on the combined effects of Claimant's impairments, the court has no way to provide meaningful judicial review of the ALJ's decision. On remand, the ALJ must articulate his consideration of all of Claimant's severe and non-severe impairments in combination and build the requisite "logical bridge" between the evidence and his conclusion.

The Court is also concerned with the ALJ's credibility assessment. To begin, we first acknowledge that the Social Security Administration recently updated its guidance about evaluating claimant's symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's decision in this case, the application of a new social security regulation

to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999*); see also*, *Cole v. Colvin*, No. 15-3883, 2016 WL 3997246, at *1 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.").

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 F. App'x. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion. *Goble*, 385 F. App'x at 593. Consequently, we will only reverse the ALJ's credibility finding if it is "patently wrong." The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."

*Knight*, 55 F.3d at 314. Rather, SSR 16-3p requires the ALJ to consider a number of factors in addition to the objective medical evidence including (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7.

Here, when discrediting Claimant's continued complaints of pain and allegations of severe limitations, the ALJ undoubtedly relied heavily on a lack of medical evidence, which he is free to do. However, while he also mentions some other requisite factors enumerated above, his logic in that regard was somewhat flawed. For example, he appears to fault Claimant for not being able to afford continued treatment for all of his ailments throughout the relevant time period. He also assumes, without ever asking, that Claimant was choosing to spend money on alcohol instead of his $4 prescriptions. Because remand is otherwise required to consider the combined effects of Claimant's impairments, the ALJ should better articulate any reasons for discrediting Claimant's allegations aside from just a shortage of objective medical findings.

Having determined that remand is appropriate, the Court need not comment on Claimant's remaining arguments. The Court notes briefly, however, that it saw no reversible error in the ALJ's decision not to order further medical evidence. Of course, on remand, the ALJ is free to reconsider whether additional medical evaluation is

required to assess the combined effects of Claimant's impairments. As for step five, the ALJ is expected to reassess any step five determinations following his reconsideration of the combined effects of Claimant's impairments and his credibility. Lastly, Claimant's request that his case be reassigned to a different ALJ is denied as there is no evidence here of bias by the ALJ. *See Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

## IV.     CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment is granted and the defendant's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: April 4, 2017**